UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PACIFIC CHOICE SEAFOOD COMPANY, et al.,

                Plaintiffs,

      v.

WILBUR ROSS,[1] et al.,

                Defendants.

Case No. 15-cv-05572-HSG

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 70, 78

Pending before the Court are Plaintiffs' and Defendants' cross motions for summary judgment. Dkt. Nos. 70, 78. In this action, Plaintiffs Pacific Choice Seafood Company, Sea Princess, LLC, and Pacific Fishing, LLC challenge certain provisions of a federal fisheries management program that establishes an individual fishing quota program (the "IFQ Program"). For the reasons detailed below, the Court **DENIES** Plaintiffs' motion and **GRANTS** Defendants' motion for summary judgment.

## I. BACKGROUND

This case concerns the manner in which the Secretary of Commerce and the National Marine Fisheries Service ("NMFS") regulate the fishing of Pacific non-whiting fish species off the coasts of Washington, Oregon, and California.

### A. Statutory Background

Congress enacted the Magnuson-Stevens Fishery Conservation Act ("Magnuson Act" or the "Act") to "conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation

---

[1]Wilbur Ross is now the Secretary of Commerce. Pursuant to Federal Rule of Civil Procedure 25(d), Wilbur Ross is substituted for Penny Pritzker as the defendant in this suit.

and management principles." 16 U.S.C. § 1801(b)(1), (3). The Act established eight regional fishery management councils, tasked with developing fishery management plans ("FMP") and any necessary amendments and implementing regulations to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. §§ 1801(b)(4)–(5), 1852(a)(1)(F), (h)(1), 1853(c). NMFS, acting on behalf of the Secretary, reviews these FMPs to ensure compliance with national standards for fishery conservation and management, the Magnuson Act, and any other applicable law.[2] *See id.* §§ 1851(a), 1854.

As part of a region's FMP, the councils may limit access to the fishery through limited access privilege programs ("LAPPs") such as quotas. *See* 16 U.S.C. §§ 1802(26), 1853a. In creating such a program, councils must take into account several factors: participation in the fishery; historical fishing practices; economics; capability of vessels to engage in other fisheries; cultural and social framework and affected fishing communities; fair and equitable distribution of access privileges; and other relevant considerations. *Id.* §§ 1853(b)(6), 1853a(c). The councils must also ensure that no privilege holders "acquire an excessive share" of the total limited access privileges. *See id.* § 1853a(c)(5)(D). Moreover, any privilege created under a LAPP "may be revoked, limited, or modified at any time." *See id.* § 1853a(b)(2).

## B.    Pacific Groundfish Fishery

At issue in this case are amendments to the Pacific Coast Groundfish Fishery Management Plan, the FMP for the Pacific Groundfish Fishery that covers the United States' territorial waters off the coast of Washington, Oregon, and California (the "Fishery"). *Cf.* 42 Fed. Reg. 12,937–98 (Mar. 7, 1977). The Fishery is overseen by the Pacific Fishery Management Council (the "Council"). *See* 16 U.S.C. § 1852(a)(1)(F). Every two years, the Council establishes catch limits, which "represent an annual quantity of fish that the groundfish fishery as a whole may catch." *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1089 (9th Cir. 2012). Prior to the amendments at issue in this case, the Council regulated the Fishery's catch limits through trip, gear, and season restrictions. *See id.*; *see also* 75 Fed. Reg. 32,994, 32,995–96 (June 10, 2010).

---

[2] Because NMFS acts on behalf of the Secretary, the Court refers primarily to "NMFS" rather than the Secretary or the Defendants collectively in this order.

Beginning in 2003, however, the Council began developing a new LAPP to manage the Fishery instead. *Pac. Coast*, 693 F.3d at 1089.

### C. Challenged Amendments

Amendments 20 and 21 to the Fishery's FMP created a new LAPP — the IFQ Program — through which participants receive permits to harvest a specific portion or quota share ("QS") of the Fishery's total allowable catch. The Council presented the amendments to NMFS on May 7, 2010. *See* Dkt. No. 72-4 (letter from Council to NMFS). NMFS approved the amendments in August 2010, and issued two sets of regulations codifying the amendments. *See* 75 Fed. Reg. 60,868 (Oct. 1, 2010); 75 Fed. Reg. 78,344 (Dec. 15, 2010). The IFQ Program became effective on January 1, 2011, and established the following provisions relevant to this action: (1) a 2.7% aggregate limit on the amount of total QS of all non-whiting species fished in the Pacific Fishery that a person or entity may own or control, *see* 50 C.F.R. §§ 660.11, 660.140(d)(4)(i)(C); (2) a regulation that defines "control" as, *inter alia*, "the ability through any means whatsoever to control or have a controlling influence" over QS, 50 C.F.R. § 660.11; (3) a divestiture rule that required any participant whose ownership or control of QS exceeded the 2.7% limit to divest its excess shares by November 30, 2015, 50 C.F.R. § 660.140(d)(4)(v); and (4) a revocation provision providing that NMFS would automatically revoke any excess QS not divested by the November 30, 2015, deadline, 50 C.F.R. § 660.140(d)(4)(v).

On November 9, 2015, NMFS issued a final rule detailing the specific process for revocation of QS, added an option for the abandonment of QS, established that excess QS would be proportionally revoked across fish species and permits, and reaffirmed that revoked QS would be proportionally distributed among the Pacific Fishery participants (the "2015 Rule"). *See* 80 Fed. Reg. 69,138 (Nov. 9, 2015).

### D. Plaintiffs' Quota Share

Pacific Fishing is a limited liability company ("LLC") that owns, *inter alia*, six other LLCs, including Plaintiff Sea Princess, which in turn own vessels that participate in the Fishery. *See* Dkt. No. 71 ¶ 2. Plaintiff Pacific Choice Seafood Company operates a seafood processing facility year-round in Eureka, California. *See* Dkt. No. 70 at 8. According to Plaintiffs, more than

3

1    half of the groundfish it receives comes from four fishing vessels, all owned by LLCs that are, in

2    turn, owned by Plaintiff Pacific Fishing. *See id.*

3         On July 28, 2015, Plaintiff Pacific Fishing received a letter from NMFS informing the

4    company that it owned QS in excess of the aggregate limit and would have to divest by November

5    30, 2015, or NMFS would revoke the excess QS. Dkt. No. 71, Ex. A. Pacific Fishing divested its

6    shares by the November 30 deadline. *See id.* ¶ 6.

7    ## II.    LEGAL STANDARD

8         The Court's review in this action is governed by the Administrative Procedure Act

9    ("APA"). *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 433 U.S. 519, 558

10   (1978); 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)–(D). The Court must set aside regulations if

11   they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

12   law . . . ." 5 U.S.C. § 706(2)(A). Summary judgment is an appropriate procedural mechanism

13   "for deciding the legal question of whether the agency could reasonably have found the facts as it

14   did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). Under the arbitrary and

15   capricious standard, the Court must "determine whether the Secretary has considered the relevant

16   factors and articulated a rational connection between the facts found and the choices made."

17   *Midwater Trawlers Coop v. Dep't of Comm.*, 282 F.3d 710, 716 (9th Cir. 2002). This standard is

18   deferential, presuming the agency action to be valid and affirming if there is a reasonable basis for

19   the decision. *Ranchers Cattlemen Action Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th

20   Cir. 2007). The Court reviews the administrative record as a whole, and decides whether the

21   action is acceptable. *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see

22   also Ranchers Cattlemen Action Fund*, 499 F.3d at 1115.

23   ## III.   ANALYSIS

24        Plaintiffs challenge the IFQ Program, contending that NMFS acted *ultra vires* in defining

25   the scope of ownership and control over QS and set an arbitrary and capricious aggregate limit on

26   QS. Plaintiffs allege that as a result of these illegal rules, they had to divest valuable QS. The

27

28

Court first addresses the ownership and control limitations and then turns to the aggregate limit.[3]

## A. Ownership and Control

The IFQ Program limits how much QS a person may own or control, either individually or collectively. *See* 50 C.F.R. § 650.140(d)(4). Under the program, "[n]o person may own or control, or have a controlling influence over, by any means whatsoever an amount of QS . . . that exceeds [the aggregate limit]." *Id.* § 660.140(d)(4)(i)(A). "[O]wnership" of QS includes the QS owned by a person as well as the portion of QS "owned by an entity in which that person has an economic or financial interest, where the person's share of interest in that entity will determine the portion" it deems "owned" by the person. *Id.* § 660.140(d)(4)(ii). "Control" includes "the ability through any means whatsoever to control or have a controlling influence over [an] entity to which QS . . . is registered." *Id.* § 660.140(d)(4)(iii)(H). The IFQ Program based its initial allocation of QS on prior fishing history before the implementation of the Program. *See id.* § 660.140(d)(8).

Plaintiffs challenge the definitions of "ownership" and "control" as overly expansive and charge that as a consequence, "permit holders are left with an extraordinarily low Aggregate Limit and no certainty about how to conduct business in a way that does not run afoul of the Ownership and Control Rules." Dkt. No. 70 at 10.

### i. Corporate Common Law

Plaintiffs first contend that NMFS acted *ultra vires* by adopting definitions of ownership and control that conflict with traditional notions of "common law corporation principles." *See* Dkt. No. 70 at 10–18. Because the Magnuson Act does not explicitly authorize NMFS to regulate contrary to these principles, Plaintiffs urge the Court to set the ownership and control rules aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

The United States Supreme Court has stated that "Congress is understood to legislate against a background of common-law adjudicatory principles . . . where a common-law principle

---

[3] Plaintiffs concede that they "are not pursuing their Fourth and Fifth Claims for Relief." *See* Dkt. No. 70 at i, n.1; *see also* Dkt. No. 14 ¶¶ 64–74. Accordingly, the Court **GRANTS** summary judgment as to these claims.

is well established" and no "statutory purpose to the contrary is evident." *Astoria Fed. Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (finding federal Age Act action was not precluded by state administrative rulings regarding age-discrimination claims).  Plaintiffs argue that the Magnuson Act explicitly invokes corporate law principles because under the IFQ program, QS permits may be owned by "persons, *corporations*, partnerships, or other entities."  *See* 50 C.F.R.§ 660.11 (defining "ownership interest") (emphasis added).  Plaintiffs identify two relevant common law principles that the ownership and control definitions violate.  First, Plaintiffs state that assets of a corporation are owned by the corporation, and not its shareholders.  *See* Dkt. No. 70 at 11 (citing *Hawley v. City of Malden*, 232 U.S. 1, 9 (1914)).  And second, as a corollary, assets of a corporation are controlled by the corporation's officers and directors, and not the individual shareholders.  *See id.* at 12 (citing *Humphreys v. McKissock*, 140 U.S. 304, 312 (1891); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)).

According to Plaintiffs, the definitions of ownership and control violate these common law principles and render the corporate structure a nullity:  under the IFQ Program, NMFS may consider the assets of a subsidiary, or even the assets of a controlling shareholder, for purposes of determining QS share.  *Cf. Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citing cases).  Further, Plaintiffs contend that NMFS actually *did* ignore Plaintiffs' corporate structure by considering Plaintiff Sea Princess LLC's QS when determining whether its parent company, Plaintiff Pacific Fishing, LLC, owned or controlled QS in excess of the aggregate limit.  *See* Dkt. No. 70 at 7; *see also* Dkt. No. 71, & Ex. A.  The Court is not persuaded by Plaintiffs' reasoning.

As an initial matter, the Court finds that the ownership and control definitions do not displace corporate law principles because they do not alter or interfere with corporate structure or corporate assets.  Rather, they impose conditions on *QS* — a regulatory privilege that does no more than "grant [] permission . . . to engage in activities permitted by [the IFQ Program]."  *See* 16 U.S.C. § 1853a(b)(5).  As contemplated by Congress, QS "may be revoked, limited, or modified at any time."  *See id.* § 1853a(b)(2).  Moreover, Congress explicitly stated that QS "shall

1    not confer any right of compensation to the holder . . . if it is revoked, limited, or modified." 16

2    U.S.C. § 1853a(b)(3). Although corporations like Plaintiffs may participate in the IFQ Program,

3    and may transfer, sell, or even lease QS, *see* 16 U.S.C. §§ 1853a(c)(1)(D), (c)(5)(D) (c)(7), they do

4    so subject to these broad limitations. *Cf.* 75 Fed. Reg. 32,994, 33,040 (June 10, 2010)

5    (characterizing the IFQ Program as "confer[ring] a conditional privilege of participating in the

6    Pacific coast groundfish fishery."). The relevant ownership and control definitions are merely

7    embodiments of these authorized statutory limitations, and place conditions on participation in the

8    IFQ Program. *See* 50 C.F.R. § 650.140(d)(4).

9        Plaintiffs counter that the Ninth Circuit has considered QS "property" under similar

10   programs, *see Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588–89 (9th Cir. 1998), such

11   that traditional notions of ownership and control circumscribe the limitations NMFS may place on

12   QS. The Ninth Circuit's holding in *Foss*, however, says nothing about the limitations that NMFS

13   may place on QS, as long as it provides adequate due process. In *Foss*, the plaintiff challenged

14   NMFS' denial of his application for a fishing quota for halibut and sablefish as untimely during

15   the LAPP program's initial allocation period. *See id.* at 586–88. In determining whether the

16   plaintiff had a protectable property interest in the permit for purposes of due process, the Court

17   focused on whether NMFS had discretion to reject applicants who met the statutory criteria for the

18   permits. *Id.* at 587–88. The Court concluded that the plaintiff "ha[d] a protectable property

19   interest in receiving the IFQ permit" because an applicant's eligibility turned on objective

20   qualifications, and the regulations significantly restricted NMFS' discretion in issuing them. *Id.*

21   The Court nevertheless held that NMFS had afforded the plaintiff an adequate opportunity to

22   present his case, and thus satisfied the requirements of due process. *Id.* at 590 (citing *Mathews v.*

23   *Eldridge*, 424 U.S. 319, 348–49 (1976)). Here, in contrast, the statutory language explicitly

24   permits NMFS to limit, modify, or even revoke QS, and Plaintiffs do not raise any due process

25   challenges to the regulatory ownership and control definitions.[4]

26

27   [4] The Court also notes that those few courts that have addressed whether similar fishing permits
     create *substantive* property rights have concluded that they do not. *See Coastal Conservation*

28   *Ass'n v. Locke*, No. 2:09-CV-641-FTM-29, 2011 WL 4530631, at *17–*19 (M.D. Fla. Aug. 16,
     2011), *report and recommendation adopted sub nom. Coastal Conservation Ass'n v. Blank*, No.

United States District Court
Northern District of California

Plaintiffs' other cases are similarly inapposite. Critically, none involve regulatory privileges or the conditions placed on them. Rather, *United States v. Bestfoods* concerned whether liability may be imposed on corporate parents for their subsidiaries' conduct. 524 U.S. 51, 62 (1998). The Supreme Court rejected such derivative liability for parents based on polluting facilities owned or operated by their subsidiaries under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") absent a showing that corporate veil-piercing was warranted. *Id.* at 63–64. In doing so, the Court reasoned that CERCLA did not "speak directly" to whether that statute would abrogate corporate law's limited liability principles. *Id.*; *see also Dole Food*, 538 U.S. at 476 (declining to pierce the corporate veil and consider a corporation's subsidiary an "instrumentality" of Israel under the Foreign Sovereign Immunities Act of 1976 absent a statutory text or structure that encompasses indirect ownership). Ignoring corporate formalities in that context would impose liability on the back end without affording notice to the corporations of this interpretation. Here, however, NMFS has, at the outset, placed conditions on a corporation's voluntary participation in the IFQ Program and its control over and use of QS.

Moreover, to the extent Congress generally legislates against the backdrop of some body of common law corporate principles,[5] this assumption does not apply "when a statutory purpose to the contrary is evident." *Astoria*, 501 U.S. at 108. And here, the statutory purpose is manifest. As discussed above, the Magnuson Act did not intend for QS to be treated as a property right, but rather a privilege subject to conditions. *See* 16 U.S.C. § 1853a(b). Congress also provided NMFS

---

2:09-CV-641-FTM-29, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011); *Conti v. United States*, 291 F.3d 1334, 1341–42 (Fed. Cir. 2002) (finding no property interest in swordfish fishing permit cognizable under the Fifth Amendment Takings Clause because permit was merely revocable license); *Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce*, 720 F. Supp. 2d 564, 576 (D.N.J. 2010), *aff'd sub nom. Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106 (3d Cir. 2011) (same). *Cf. Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1373–83 (Fed. Cir. 2004) (finding no property interest in fishing for mackerel and herring cognizable under the Fifth Amendment Takings Clause).

[5] The Court also has concerns with Plaintiffs' failure to fully identify the contours of the "federal corporate common law" that they claim forms the basis of the "well established" backdrop against which Congress legislated. *See Astoria*, 501 U.S. at 108. At the hearing on the cross-motions for summary judgment, Plaintiffs acknowledged that they had only identified the "primary" components of the applicable federal common law.

with broad discretion over what conditions it could impose. Congress charged NMFS with ensuring "fair and equitable" allocation of fishing privileges such that "no particular individual, corporation, or other entity acquires an excessive share of such privileges." *See* 16 U.S.C. § 1851(a)(4); *see also* 16 U.S.C. § 1853a(c)(5)(D) (requiring that LAPP programs establish measures "to prevent an inequitable concentration of limited access privileges"). Additionally, NMFS must "provide for the sustained participation of [fishing] communities," and minimize adverse impacts on such communities. *Id.* § 1851(a)(8). In doing so, NMFS "shall consider the basic cultural and social framework of the fishery," and develop both "policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries" and "procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery." 16 U.S.C. § 1853a (c)(5)(B).

The Magnuson Act thus directs the agency to look broadly at how and where QS is concentrated. *Cf. Astoria*, 501 U.S. at 107–13 (analyzing statutory purpose underlying federal Age Act to determine if federal action was precluded by state administrative findings); *see also United States v. Texas*, 507 U.S. 529, 534–36 (1993) (analyzing statutory structure and purpose of Debt Collection Act of 1982 to determine if it abrogates federal common-law right to collect prejudgment interest on debts owed by the States). The ownership and control definitions were accordingly designed to effectuate the statutory directives and eliminate an obvious loophole that would exist in the IFQ Program if individuals could avoid the aggregate limit simply by creating new, nominally separate entities to accumulate more QS.[6] *Cf.* Administrative Record ("AR") Disk 3 at 467–70 (Council meeting minutes discussing ownership and control aggregate limit definitions); *see also* AR Disk 1 B.22 at 1053–59 (Final Environmental Impact Statement detailing Council's analysis for passing and implementing ownership and control definitions). The Council attempted to balance the risk of circumvention against the risk of "[u]nintended constraints on business arrangements," as well as the need for an efficient and cost-effective

---

[6] The potential for circumvention is evident from Plaintiffs' own recognition that more than half of the groundfish that Plaintiff Pacific Choice Seafood Company receives comes from four fishing vessels, all owned by LLCs that are, in turn, owned by Plaintiff Pacific Fishing. *See* Dkt. No. 70 at 8.

enforcement mechanism.  *See id.* at 1057–58; *see also id.* at 1053 (acknowledging that the proposed definitions would "make it more difficult for an individual to circumvent the [aggregate limit] by exerting influence over a number of different legal entities (*e.g.*, partnerships or corporations)").

The Court finds that NMFS acted within its statutory authority when defining ownership and control for purposes of the IFQ Program.

### ii. Agency Discretion

Plaintiffs also argue briefly that the definition of "control" is arbitrary and capricious because it grants NMFS "unlimited discretion to find 'control' in any unidentified conceivable circumstances."  Dkt. No. 70 at 19 (citing 5 U.S.C. § 706(2)(A)).  In addition to enumerating several illustrative circumstances in which a person "controls" QS, NMFS also included a catchall provision, finding "control"  where "[t]he person has the ability *through any means whatsoever* to control or have a controlling influence over the entity to which QS . . . is registered . . . ."  50 C.F.R. § 660.140(d)(4)(iii) (emphasis added).

Plaintiffs fail to explain why this discretionary language constitutes an abuse of discretion. Rather, they cite a single case, *Mission Group Kansas, Inc. v. Riley*, in which the Tenth Circuit interpreted regulations promulgated by the Secretary of Education under the Higher Education Act of 1965 ("HEA").  *Mission*, 146 F.3d 775, 784 (10th Cir. 1998).  In *Mission*, the Secretary required a non-profit institution to derive at least 15% of its gross revenue from sources other than Title IV as part of its provisional certification to participate in programs under Title IV (the "85/15 Rule").  *See id.* at 777–78.  The Secretary relied on its own regulation, which conditions provisional certification on "the institution's . . . compliance with *any additional conditions* specified in the institution's program participation agreement that the Secretary requires the institution to meet . . . ."  *Id.* at 777 (emphasis in original) (citing 34 C.F.R. § 668.13(c)(4)(ii)).

The district court invalidated the Secretary's action as beyond the authorization granted by the HEA.  *Id.* at 778.  Contrary to Plaintiff's suggestion, the Tenth Circuit did not reject the Secretary's conduct as arbitrary and capricious.  *See id.* 780–85.  The Court instead reversed the district court's application of *Chevron* deference and remanded the action for further findings.  *Id.*

10

(citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, (1984)). Although the Court noted in passing that the "unrestrictive" language in the regulations could render them "open to challenge as unconstitutionally vague," the plaintiff in *Mission* did not raise that argument. *Id.* at 781, & n.6. Here too, Plaintiffs do not raise a vagueness argument. Accordingly, the Court does not address this claim except to point out, as discussed above, that the "control" definition is tethered to a specific goal of preventing circumvention of the aggregate limit. *Cf.* AR Disk 1 B.22 at 461, 547–48 (Final Environmental Impact Report discussing how aggregate limits may affect processors and fishing communities); *see also id.* at 1058 (noting Council's proposed "control" definition is based on the North Pacific Crab Rationalization Program's definition, which encompasses all persons who "ha[ve] the ability through any other means whatsoever to control the entity to which the QS is registered").

## B. Aggregate Limit

Plaintiffs next contend that NMFS' decision to set the aggregate limit at 2.7% is arbitrary and capricious because NMFS did not engage in "reasoned decisionmaking." *See* Dkt. No. 70 at 19. Plaintiffs argue that NMFS failed to provide a clear interpretation of ambiguous statutory terms in the Magnuson Act, including the meaning of "excessive share" and "inequitable concentration," and that NMFS failed to provide a reasoned explanation for its decision setting the aggregate limit. The Court addresses each argument in turn.

### i. Ambiguous Terms

Under the Magnuson Act, NMFS must, *inter alia*, "ensure that limited access privilege holders do not acquire an *excessive share* of the total limited access privileges in the program." *See* 16 U.S.C. § 1853a(c)(5)(D) (emphasis added). To do so, the Act guides NMFS to "establish[] any other limitations or measures necessary to prevent an *inequitable concentration* of limited access privileges." *Id.* § 1853a(c)(5)(D)(ii) (emphasis added). Plaintiffs contend that "excessive share" and "inequitable concentration" are ambiguous terms, and thus NMFS had to define them before setting the aggregate limit. *See* Dkt. No. 70 at 20–23. Plaintiffs place considerable weight on the D.C. Circuit's reasoning in *Pearson v. Shalala*, in which the court explained that in order to provide a reasoned explanation for its rejection of the plaintiff's health claims, and to avoid

11

arbitrary and capricious action, the FDA had to "giv[e] some definitional content to the phrase 'significant scientific agreement.'" *See Pearson*, 164 F.3d 650, 660 (D.C. Cir. 1999) ("To refuse to define the criteria it is applying is equivalent to simply saying no without explanation."). The D.C. Circuit clarified, however, that the FDA was not "obliged to issue a comprehensive definition all at once." *Id.* Instead, "it must be possible for the regulated class to perceive the principles which are guiding agency action." *Id.*

The Court finds that NMFS has sufficiently articulated "the principles which are guiding" its determination of the aggregate limit. As an initial matter, the Court notes that the Magnuson Act provides some of its own guidance, explaining that any LAPP should "promote . . . (i) fishing safety; (ii) fishery conservation and management; and (iii) social and economic benefits" to the fishery. 16 U.S.C. §§ 1853a(c)(1)(C). The initial allocations of QS should be "fair and equitable," taking into account the need to develop and sustain small owner-operated vessels and fishing communities, including "those that have not historically had the resources to participate in the fishery." *See id.* §§ 1853a(c)(3)(A)–(B), (c)(4)(C), (c)(5)(B), (c)(5)(D); *see also id.* § 1851(a)(8) ("Conservation and management measures shall . . . take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.").

Moreover, in 2007, NMFS, in collaboration with the Regional Fishery Management Councils, issued "The Design and Use of Limited Access Privilege Programs" (the "Guidance"). *See* AR Disk 1 H.527 at 59–69. In it, the issuers of the Guidance detail their primary concerns with concentration of QS: market power inequities (*i.e.*, monopoly with a single seller or monopsony with a single buyer) and changes to the fishing communities more broadly. *See id.* at 59–61. The Guidance explains that taking into account both market power ("MP") and the council's fishery management objectives ("MO") may "assure that potential share accumulation is consistent with management objectives and [] protect consumers against manipulation of market prices." *Id.* at 62–63. The Groundfish Management Team ("GMT") relied on this Guidance when analyzing aggregate limits in March 2009, proposing levels that would limit the accumulation of

12

market power and distribute the benefits of QS ownership across more entities. *See* AR Disk 1 H.497 at 2–3. This 2009 GMT report further noted that the "one vessel, one owner" approach to QS harmonized with the "history of independent 'small entity' vessel owners in the [F]ishery," and would provide a useful reference point when setting control limits. *Id.* at 4–6. The Council, in turn, relied on GMT's analysis while developing the IFQ Program. *See id.* H.497 at 2–3, 7; *see also id.* H.500–01.

Similarly, the June 2010 Final Environmental Impact Statement ("FEIS") explains that the Council considered the "ordinary meanings" of the terms "excessive" and "inequitable" to determine levels of QS ownership and usage that were not "unreasonable, unnecessary, or unfair considering the Council's overall management objectives for the [F]ishery." *See* AR Disk 1 B.22 at 1064. The FEIS further explains that:

> What constitutes 'excessive shares' may be socially determined or economically determined. On an economic basis, an excessive share would be one that would be expected to result in a sector with market power . . . From a social policy perspective, concentration of ownership affects the social and community structure and the sense of equity that may, in part, be grounded in the history of fishery management, which has largely been based on common property concepts.

*See id.* at 860; *see also id.* at 461 (placing limits to "affect the distribution of economic performance" in fishing communities); *id.* at 547 (noting that the proposed 2.7% aggregate limit "could provide new avenues for community involvement in the fishing industry that could benefit communities both socially and economically . . . Theoretically, if there were no control limits . . . one community or company could buy up all the QS to the detriment of all other communities and businesses."). In short, the administrative record indicates that NMFS interpreted "excessive share" and "inequitable concentration" to mean "unreasonable, unnecessary, or unfair," *see id.* at 1064, and grounded its determination of the aggregate limit in concerns regarding entities' market power, while considering the need to foster development of diverse fishing communities in the Fishery.

In response, Plaintiffs contend that NMFS' aggregate limit was nevertheless arbitrary and capricious because NMFS failed to follow its own Guidance. *See* Dkt. No. 79 at 9–12. The Court

13

is not persuaded. Plaintiffs artificially limit NMFS' determination of the aggregate limit to a mathematical formula based on MP and MO. *See id.* at 10–11. However, the Guidance itself explains that "the basic philosophy underlying the [Guidance] is that the Councils should have as much latitude as possible as they design fishery management plans." *See* AR Disk 1 H.527 at 10. Although market power may be easily derived and informed by existing antitrust principles, the Guidance further explains that there are no established rules for setting the MO. *Id.* at 61–69. Rather, aggregate limits will be determined based on balancing different management objectives alongside market power limitations. *Id.* NMFS identified such management objectives, and, as discussed below, provided a reasoned explanation for setting the aggregate limit.

### ii. Reasoned Explanation

Plaintiffs next contend that NMFS adopted the Council's recommendation without any of its own analysis, and that even the Council's analysis is insufficient to support the 2.7% aggregate limit. The Court finds that NMFS acted within its authority to adopt the Council's reasoning, and that it has articulated a reasoned explanation to support the 2.7% aggregate limit.

### a. Agency Decision

As a threshold matter, the Court is not persuaded by Plaintiffs' attempts to differentiate the analysis conducted by the Council from the analysis adopted by NMFS. *See* Dkt. No. 70 at 24–25. Plaintiffs emphasize that the APA limits judicial review to "final *agency* action[s] for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Plaintiffs, therefore, ask the Court to limit its review to the face of the final rule, and state that "there is *no explanation* for why NMFS decided to set the Aggregate Limit at 2.7%." *Id.* at 25 (emphasis in original).

In evaluating agency action, the Court reviews the entire administrative record. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014). Doing so ensures that the reviewing court does not "substitute its judgment for that of the agency," in contravention of the substantial discretion the APA generally affords agencies. *Id.* In the context of the Magnuson Act, the entire record includes the analysis conducted by the councils. *See, e.g.*, *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 888–900 (9th Cir. 2010). In *Fisherman's Finest*, for example, the plaintiff challenged an amendment to the relevant FMP, which reduced the

allocation of Pacific cod for plaintiff's specific fishing sector (in an FMP based on fishing methods and gear restrictions rather than QS). *See id.* at 889–92. In concluding that the Secretary, acting through NMFS, did not act arbitrarily and capriciously in amending the Pacific cod allocation, the Court considered the Council's analysis interchangeably with NMFS' own. *See, e.g.*, *id.* at 895–96 (addressing plaintiff's argument that "NMFS failed to analyze the impact of the allocations" by considering what "*the Council* [] consider[ed]" (emphasis added)). Plaintiffs point out that the final rule at issue in *Fisherman's Finest* made reference to the council and some of its reasoning. *See* 72 Fed. Reg. 50788, 50,792–96. However, the Court in *Fisherman's Finest* did not condition its reliance on the council's reasoning on the presence of any specific language in the final rule adopting the council's analysis. *Cf. Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990) ("It is [] especially appropriate for the Court to defer to the expertise and experience of those individuals and entities — the Secretary, the Councils, and their advisors — whom the [Magnuson] Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.").

Plaintiffs' cases are not to the contrary. In *Anglers Conservation Network v. Pritzker*, the D.C. Circuit stated that "[a]n action by the Mid–Atlantic Council does not qualify as an 'agency action' under the APA because . . . a fishery management council is not itself an 'agency' subject to judicial review." 70 F. Supp. 3d 427, 437 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016). The question before the Court in *Anglers*, however, was whether it could review the council's decision not to propose an amendment to NMFS that would include certain fish species in the relevant fishery. *Id.* at 433–34. The council had not proposed an amendment and NMFS had not issued any final rule. *Id.* The Court concluded that there was no final agency action to review. *Id.* at 436–37. In contrast, the Amendments and the 2015 Rule constitute final agency action, and the relevant question is the content of the administrative record. Similarly inapposite are Plaintiffs' cases criticizing courts' reliance on an agency's *post hoc* rationalizations for its decisions. *See, e.g.*, *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 917 (D.C. Cir. 2011) (rejecting the Fish and Wildlife Service's attempts to explain its decisionmaking with a new theory not in the

15

final rule and outside the administrative record).  The administrative record that NMFS points to in this case was created before this litigation began.

### b.  Record Support

The Court finds that in evaluating the record as a whole, there is ample support for NMFS' adoption of the 2.7% aggregate limit.  In its rulemaking documentation, NMFS refers throughout to the Council's analysis, noting the breadth of considerations at play in establishing the aggregate limit:

> In developing limits, the Council noted the tension between allowing sufficient accumulation to improve the efficiencies of harvesting activities and preventing levels of accumulation that could result in adverse economic and social effects.  In determining the appropriate levels, the Council considered a wide range of factors such as social benefits, impact on labor, impacts on processors, impacts on harvesters, impacts on the public, the number and sizes of firms, within-sector competition, market power, efficiency, geographic distribution, communities, and fairness and equity.

*See* 75 Fed. Reg. 32,994, 33,004 (June 10, 2010).  NMFS also identified the FEIS as a key component of the agency's analysis.  *See id.* at 33,019, 33,025.  The FEIS, prepared by NMFS and the Council, describes the years-long process to set an appropriate aggregate limit.  *See* AR Disk 1, B.22 at 1064–68.  The process involved input from multiple sources, including the Council's advisory bodies:  the GMT, the Groundfish Allocation Committee ("GAC"), and the Groundfish Advisory Subpanel ("GAP").  *See, e.g.*, *id.* at 1065–77.  The FEIS explains the 2.7% aggregate limit by incorporating their analysis.  *Id.*

Beginning in 2007, the GAC formulated aggregate limit proposals based on vessels' past performance in the Fishery.  *See id.* at 1065.  They analyzed limits that were generally at or above initial QS allocations, "pa[ying] particular attention to the maximum fleet consolidation level, or minimum fleet size, permitted by a particular accumulation limit."  *Id.*  Further analysis continued through 2008.  *Id.* at 1065–68.  Part of this early analysis measured the degree of market concentration at various control limits, as a proxy for competition in the Fishery.  *See id.* H.431 at 15.  The Council used a tool called the "Herfindahl Index," and concluded that "a 10 percent limit

16

on aggregate non-whiting quota share will assure an unconcentrated outcome" in the Fishery. *Id.* The Council further noted that its current proposed aggregate limit of between 1.5 and 3% would fall within the "unconcentrated" range. *Id.* at 20–21.

Despite Plaintiffs' contention in their motion, the Herfindahl Index's 10 percent ceiling need not — and did not — end the inquiry. The Council emphasized that the "accumulation limits are aimed at more than just preventing market power or other anticompetitive situations from developing in the fishery." *See* AR Disk 1 B.22 at 1064–68; *see also id.* at 1052 (rejecting reliance solely on antitrust laws because "the level of aggregation required to establish the anticompetitive behaviors that are of antitrust concern may be substantially greater than the levels of aggregation that trigger concerns about fairness and equity, geographic distribution, communities, or sector health"). Instead, the Council endeavored "to identify percentage limits that would be low enough to prevent excessive control and use of QS/QP, while at the same time, high enough not to interfere with the objectives of providing for improved operational flexibility for the fleet and a viable, profitable, and efficient groundfish fishery." *See id.* at 1064.

The GMT subsequently utilized a revenue-based approach to account for the size and profitability of the Fishery, specifically ensuring adequate revenue for participating vessels. *See id.* H.497. The GMT relied on a 2008 study that reviewed the revenue from the Fishery's fleet and found that most were only generating enough money to cover costs rather than generating an appreciable profit. *See id.* B.22 at 1071. The study suggested that consolidating to between 40 and 50 vessels in the Fishery could increase revenue estimates. *Id.* at 1071–72. But the GMT noted that under its approach, the species-specific limits are high and "could increase control and consolidation of quota ownership in the [F]ishery." *Id.* H.497 at 20. It therefore recommended a lower aggregate limit as a "vital safeguard for achieving the Council's other management objectives for accumulation limits." *Id.* at 20, 22–23. The GMT explained that with the proposed species limits and lower aggregate limits, an "independent vessel owner has the choices of which limits to pursue in attempting to reach the maximum revenue possible under the aggregate limit." *Id.* at 22. The GMT emphasized that this provided flexibility to Fishery participants while still "maintaining an overarching level of control over individual operations." *Id.* After explaining its

revenue formula, the GMT presented a range of aggregate limits, noting that an aggregate limit of 2.3% would achieve more consolidation in the Fishery, but a 2.7% limit would allow entities to acquire their entire initial QS allocation and maximize potential revenue. *Id.* at 23–24. Under its proposed framework, a person could control enough QS for a vessel to harvest over $1 million in fish, as compared to the historic revenue of $200,000 and the $700,000 achievable in a fully rationalized fishery. *Id.* at 9–11, 15, 22; *cf.* AR Disk 1 B.22 at 1053–59.

The GAP then reviewed and endorsed this revenue-based framework, selecting the 2.7% aggregate limit. *See id.* H.500 at 1. This recommendation, the FEIS summarized, "would accommodate a fairly high level of consolidation (down to as few as about 38 entities controlling QS) and would allow entities to control QS representing up to well over a million dollars of annual ex-vessel revenue." *Id.* B.22 at 1073; *see also id.* at 810 (defining "reasonable profits" as the income necessary to pay going market prices for all labor, supplies, capital, and entrepreneurial expertise used by a firm").

Based on the record, the Court finds that the IFQ Program, including the aggregate limit, was the product of a reasoned, iterative process that began in 2007 and continued through the IFQ Program's adoption in 2010. *See, e.g.*, AR Disk 1 H.226 at 5; *see also id.* B.22 at 1064–77. Even assuming that NMFS' reasoning might offer "less than ideal clarity," the basis for the decision still "may reasonably be discerned" from the administrative record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). The breadth of NMFS' consideration readily distinguishes this case from the ones cited by Plaintiffs. In *San Antonio, Tex. By & Through City Pub. Serv. Bd. v. United States*, the Interstate Commerce Commission ("ICC") admittedly adopted a shipping rate that included a 7% increment above fully allocated costs based on nothing more than its own "policy judgment" and without relevant data from the railroads. *San Antonio*, 631 F.2d 831, 850–52 (D.C. Cir. 1980), *decision clarified*, 655 F.2d 1341 (D.C. Cir. 1981), *rev'd sub nom. Burlington N., Inc. v. United States*, 459 U.S. 131 (1982). The ICC failed to articulate "the methods by which, and the purposes for which" it chose to set the shipping rate. *Id.* at 852. Similarly, in *Tripoli Rocketry Association, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, the D.C. Circuit directed the action be returned to the

18

agency because it "never articulated the standards that guided its analysis" in categorizing ammonium perchlorate composite propellant as an explosive. *Tripoli*, 437 F.3d at 81–83. The Court finds that NMFS sufficiently explained both its methodology and its reasoning.

Plaintiffs also attempt to undercut NMFS' proffered reasoning by claiming that the analysis is premised on "'fuzzy' assumptions, numerous data gaps, uncertain projections, and [is] rushed and incomplete." *See* Dkt. No. 79 at 14–15 (citing GMT and GAP reports). NMFS acknowledges that its information is incomplete and at times imprecise, but Congress explicitly charged NMFS with using the best information available. *See* 16 U.S.C. § 1851(a)(2) ("Conservation and management measures shall be based upon *the best scientific information available*." (emphasis added)); *cf.* AR Disk 1 B.22 at 1064 ("Even with more complete information, there are no analytical methods for pinpointing precise thresholds above which limits become excessive or inequitable. Rather, the process of arriving at percentage limits involved an imprecise balancing of management objectives that left much to the policy discretion of the Council."); *id.* H.467 at 50–51. Plaintiffs do not suggest that better data or a more precise methodology was available. Nor does Plaintiffs' preference for a higher aggregate limit render NMFS' determination arbitrary and capricious. As the Ninth Circuit has explained, "[w]hen the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line-drawing." *See Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1072 (9th Cir. 2005). The Court concludes that NMFS has adequately supported its aggregate limit, and thus Defendants did not act arbitrarily and capriciously.

### C. 2015 Divestiture Rule

Lastly, Plaintiffs contend that the 2015 Rule, implementing divestiture of QS over species and aggregate limits, violates both the Magnuson Act and the APA. Plaintiffs state that this Rule was unlawful because it "is an outgrowth of, gives effect to, and extends into the future" the ownership and control definitions and the aggregate limit. *See* Dkt. No. 70 at 33. As discussed in Section III.A–B, the Court finds that these facets of the IFQ Program were established pursuant to the Magnuson Act and do not violate the APA. The Court therefore, rejects Plaintiffs' challenge on this basis.

Secondarily, Plaintiffs argue that NMFS violated the APA because the 2015 Rule did not delay implementation of the QS divestiture while the Council determined QS reallocation for the widow rockfish, part of the non-whiting species in the Fishery. *See id.* at 33–34. When NMFS initially adopted the IFQ Program, it had determined that the widow rockfish was an overfished species and thus set low QS allocations for that species. *See* AR Disk 4 PFD.788. However, in 2011, the Council determined that the stock was "rebuilt" sufficiently to support reallocation. *See id.* It still had to determine how to do so, *id.*, and in the meantime, regulations prohibited the transfer and divestiture of widow rockfish QS, *see* 50 C.F.R. §§ 660.140(d)(3)(ii)(B)(2), 660.140(d)(4)(v). Plaintiffs urge that NMFS should have delayed implementation of the divestiture rules until after the widow rockfish reallocation because it risked a second, and costly divestiture if the reallocation increased their QS above the aggregate limit.

As with Amendments 20 and 21, the Court finds that the administrative record supplies a reasoned explanation for the determination to move forward with the divestiture. Both NMFS and the Council were aware of the potential interaction between the widow rockfish reallocation and the divestiture timeline, and the Council explored options for moving forward or delaying divestiture. *See* AR Disk 4 PFD.788; *id.* PFD.755–56; *id.* PFD.822, 869–70. They had also determined that the reallocation of widow rockfish QS would only alter the species and aggregate limits for two or three entities. *See* PFD.1070–71. The Council reasoned that even if those entities could not engage in their "optimal divestiture strategy," they "will be able to trade QS afterward to rebalance their accounts." *Id.* PFD.756; *see also id.* PFD.914–20. Moreover, the Council analyzed the consequences of the Rule across a variety of categories. *Id.* PFD.918–19. The Council raised concerns about "fairness" and "equity" because a further delay would "extend[] the amount of time those with amounts in excess of limits benefit, and delay[] the time before which others will have access to that QS." *Id.* PFD.919. The Council ultimately decided to move forward with the divestiture. *See id.* at PFD.976–77. It further explained that "when widow QS is reallocated, if the reallocation puts anyone above that aggregate limit, they will have until the widow QS divestiture deadline [12 calendar months after the reallocation is completed] to bring themselves back within the aggregate QS control limit." *Id.* at PFD.977; *see also* 80 Fed.

Reg. 69,138, 69,140 (Nov. 9, 2015). The Court finds that Defendants did not act arbitrarily or capriciously in adopting the 2015 Rule.

## IV.    CONCLUSION

Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' motion for summary judgment in its entirety. The clerk is directed to enter judgment in Defendants' favor and to close the case.

**IT IS SO ORDERED.**

Dated:   2/21/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge